# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONNIE M. LOPEZ, | CASE NO. 1:10-cv-01222-AWI-SMS |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE COURT AFFIRM THE COMMISSIONER'S DECISION |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Connie Lopez, by her attorneys, Law Offices of Jeffrey Milam, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a review of the complete record and applicable law, the undersigned recommends that the Court affirm the Commissioner's decision denying Plaintiff disability benefits.

I.   **Administrative Record**

   A.   **Procedural History**

Plaintiff was insured under the Act through December 31, 2010.  On January 29, 2007, Plaintiff applied for disability benefits pursuant to Title II of the Act, alleged disability beginning April 28, 2006.  Her claims were initially denied on March 29, 2007, and upon reconsideration, on

July 27, 2007.  On September 26, 2007, Plaintiff filed a timely request for a hearing.  Plaintiff appeared and testified at a hearing on July 1, 2008.  On January 5, 2009, Administrative Law Judge Sandra K. Rogers denied Plaintiff's application.  The Appeals Council denied review on April 21, 2010.  On June 25, 2010, Plaintiff filed a complaint seeking this Court's review.

### B.      Factual Record

**Plaintiff's testimony.**  Plaintiff (born June 20, 1948) completed eleventh grade.  She worked providing quality control for a glass manufacturer.  She testified that she stopped working when she could no longer perform the job, which required her to lift heavy machinery and parts that weighed up to 100 pounds.  Upon further questioning, Plaintiff admitted that lifting heavy weights was not part of her quality control job but related to a two-month try-out for a position that she ultimately did not receive.

Plaintiff complained of pain in her upper chest, spine, legs, and wrists, and weakness in her chest, arms, and leg.  Diagnosed with carpal tunnel syndrome in 1982, she admitted that her medical records did not address the nerve damage in her wrists, explaining that "they don't bother me unless I use them."  After twenty to thirty minutes of using her hands, said Plaintiff, her hands and wrists first became very painful, then became numb.  Plaintiff did exercises to maintain motion in her back.

Plaintiff estimated that she could lift about five pounds.  She drove for doctors' appointments and shopping, but limited her driving since it was difficult for her to look back or to either side.  She could sit for an hour before needing to change position and could stand and walk for one to two hours.  After she was on her feet for an hour, her spine and right leg would be painful.  Plaintiff needed to lie down and rest for two hours three times a day.

Plaintiff lived with her husband and adult son.  On a typical day, she woke and showered, moving "as carefully as I can," before taking her medication.  She then rested since her medication made her dizzy and light headed.  When she felt better, she washed dishes, swept the floor, and washed clothes.  As the day progressed, she alternated rest and activity until she was too tired to do more.

///

**Daily activities questionnaire.** On February 23, 2007, Plaintiff reported that her activities were limited by pain, fatigue, weakness, and dizziness. She continued to experience pain and tingling of her right leg, from which doctors harvested a vein for her cardiac bypass surgery. Because she could not lift more than five pounds, her husband helped her shop for groceries. She never drove more than ten minutes; the shoulder belt on the seat belt hurt her chest.

Plaintiff could perform housework, including making the bed, cooking, washing clothes, sweeping, and dusting. She did some yard work, such as sweeping and raking leaves, but could not start the lawn mower. Performing housework tired her, requiring her to rest.

**Medical records.** On April 26, 2006, Plaintiff saw Tiffany Gee, M.D., for a disability consultation. Dr. Gee observed that Plaintiff looked healthy and alert. Plaintiff was taking her high blood pressure medicine as instructed without experiencing any side effects. Plaintiff, who did not keep her nitroglycerine at hand, complained that she was experiencing random sharp chest pains that abated with rest. She asked Dr. Gee whether, in light of her cardiac symptoms, she could be put on disability until she retired in June. Dr. Gee suggested that Plaintiff discuss the possibility of disability with cardiologist Rajiv H. Punjya, M.D., with whom she had an upcoming appointment.

Plaintiff stopped working on April 28, 2006.

On May 18, 2006, Dr. Punjya performed left heart catheterization and left and right coronary angiography. In consultation with Plaintiff and her husband, Dr. Punjya determined to proceed with elective revascularization surgery. Isam Felahy, M.D., performed a quadruple bypass on June 6, 2006.

On July 17, 2006, Dr. Felahy reported that Plaintiff's wounds were healing well. On September 20, 2006, however, Dr. Felahy debrided and resutured Plaintiff's chest incision, which had become infected.

Although Dr. Felahy released Plaintiff to return to work on December 1, 2006, she did not return to work, telling Dr. Gee that she did not feel "up to par" and that she was easily fatigued,

///

not strong enough to lift the required weight, and still experienced pain in her right leg where the vein was harvested.

On February 2, 2007, Plaintiff saw Dr. Gee for a follow up appointment and completion of California disability forms.  Plaintiff reported that she was still experiencing chest pain.  Dr. Gee opined that the pain was likely musculo-skeletal and recommended cardiac rehabilitation to recondition Plaintiff's heart and improve the strength and mobility of her upper body.

On February 26, 2007, Plaintiff told family practitioner Portia Munkholm Ma that she had retired from her prior job and wanted to start a new, less strenuous job.  Ma also referred Plaintiff to physical therapy, noting that she had become deconditioned following her bypass surgery.

Agency medical consultant C.E. Lopez, M.D., prepared a physical residual functional capacity assessment and a case analysis on March 27, 2007.  Dr. Lopez opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, and could stand or walk about six hours in an eight-hour work day.  She had no postural or other limitations.  Dr. Lopez questioned Plaintiff's credibility, noting that her health appeared to have improved following her cardiac bypass and that she appeared able to do more than she claimed.  In addition, on an exertional questionnaire, she claimed to experience shortness of breath, although she denied shortness of breath to her cardiologist.  On July 27, 2007, following a review of the administrative record, M.E. Bayar, M.D., concurred with Dr. Lopez's opinion that Plaintiff retained the residual functional capacity to perform light work.

At an appointment with Dr. Punjya on June 12, 2007, Plaintiff reported recurrent chest discomfort and reduced functional capacity.  To determine whether Plaintiff had been successfully re-vascularized, Dr. Punjya administered an exercise-gated perfusion study on July 31, 2007.  He found no evidence of exercise-induced EKG changes suggestive of ischemia.  The study "revealed normal [left ventricular] cavity size, ejection fraction of 79%, no wall motion abnormality of concern, no major reversible perfusion defect of concern, and no evidence of transient ischemic dilatation of left ventricular cavity."  AR 258.

On August 7, 2007, Plaintiff underwent magnetic resonance imaging to evaluate her lumbar spine for spinal stenosis.  Javid Jamshidi, M.D., diagnosed:

4

    1.  Narrowing of L4-L5 level with minimal posterior of bulging of disc and ligamentous hypertrophic changes resulting in slight spinal stenosis and compression of thecal sac.

    2.  Narrowing of L3-L4 level with generalized bulging of disc and ligamentous changes without appreciable spinal stenosis.

AR 321.

On October 3, 2007, neurologist Moris Senegar, M.D., evaluated Plaintiff's back and right leg pain.  After examining Plaintiff and reviewing the MRI scans, Senegar diagnosed mild spinal stenosis at L4-L5, which he described as nonsurgical.  Although the lateral aspect of her leg pain indicated radiculopathy, the medial aspect of the pain and the calf pain related to the harvesting of a blood vessel for Plaintiff's cardiac bypass.  Senegar referred Plaintiff for physical therapy, noting that epidural steroid injections were an alternative.  On November 16, 2007, physical therapist John Bob, D.P.T., noted that limitations related to Plaintiff's lumbar stenosis responded well to physical therapy.  Bob opined that Plaintiff would continue to benefit from strengthening exercises and manual techniques to improve mobility.  After examining Plaintiff on December 21, 2007, Dr. Senegar opined that Plaintiff's back condition was fairly stable.  He prescribed Vicodin for pain, noting that Plaintiff needed it only occasionally.

On June 23, 2008, Dr. Punjya completed a questionnaire form prepared by Plaintiff's attorney.  Dr. Punjya opined that Plaintiff's medical problems precluded her from working even at the sedentary level.  She had been disabled since May 2006.  The doctor based his opinion on Plaintiff's cardiac bypass surgery, her lack of improvement following the surgery, upper body weakness, and spinal stenosis.  In Dr. Punjya's opinion, Plaintiff could sit for two hours, and stand or walk for two hours in an eight-hour work day.  She did not need to lie down or elevate her legs.  Finally, Dr. Punjya opined that Plaintiff's condition met or equaled the requirements of Listing 4.04 (ischemic heart disease).

On February 9, 2009, clinical psychologist Robert L. Morgan, Ph.D., prepared a psychological evaluation for Plaintiff's attorney.  Plaintiff and her husband reported that Plaintiff had become depressed following her second surgery to address the infection of her chest incision.  Dr. Morgan noted:

> Mrs. Lopez indicates that she is primarily home during the course of the day. She is engaged in domestic activities such as cleaning, washing dishes, driving to the store for dinner. She will make a lunch " if others stop by" and is responsible for making dinner. She notes that "I will also help others, when I need to help, I will do it." She reports that her appetite is generally good as she and her family will generally consume their primary meal during midday. She does have a driver's license and drives a motor vehicle. She watches some television, identifies reading as a primary hobby. She typically does not take a nap each day. Energy varies from one day to the next. She will retire for the evening between 9:00 and 10:00 o'clock p.m., reports that "sometimes I do not sleep well because of my pain," and is up between 7:00 and 8:00 o'clock in the morning. She will take a bath or shower every other day. Relative to her out of door activities, she reports that she will engage in gardening in the summer months and will "clean the leaves in the winter." Mrs. Lopez indicates that she will also be engaged in some activities with her husband during the day such as going to the movies, taking a long drive, going out to eat or going to the casino. Her husband will also take her shopping and drive her to the flea markets.

AR 366.

Dr. Morgan also noted that Plaintiff had no difficulty moving around the waiting room or finding her way to the office. The Beck Depression Inventory suggested mild depression. Her intelligence was average. Dr. Morgan opined that, based on her reported activities and the results of psychological testing, her depression was not a severe impairment.

Plaintiff's medications include aspirin (blood thinner), benazepril (high blood pressure), Coreg (beta blocker), folic acid (anemia), Lipitor (cholesterol), Plavix (blood thinner), Vicodin (pain), and Zetia (cholesterol).

**Vocational expert.** Stephen B. Schmidt testified as vocational expert that Plaintiff previously worked as a quality control technician (DOT No. 579.367-014), a light job with SVP4. Plaintiff performed the job as medium work. Skills acquired in that position were not transferable to any sedentary jobs.

## II. Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot,

///

considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 28, 2006. Her severe impairments, coronary artery disease, status post cardiac bypass surgery, and diabetes mellitus, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the residual functional ability to perform the full range of light work as defined in 20 C.F.R. 404.1567(b). Plaintiff was able to perform her past relevant work as a quality control technician. Accordingly, the ALJ concluded that Plaintiff was not disabled.

**III.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

402 U.S. 389, 402 (1971)), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

## IV. Credibility

Plaintiff contends that Judge Rogers' failed to give clear and convincing reasons for rejecting Plaintiff's testimony. She criticizes the ALJ's findings that (1) Plaintiff's treatment has been conservative; (2) Plaintiff's impairments are mild; and (3) Plaintiff's daily activities are not as limited as one would expect in light of Plaintiff's claimed disabling symptoms and limitations. Acknowledging that Plaintiff had been surgically treated for a cardiovascular impairments, the Commissioner emphasizes that Plaintiff's improvement within less than twelve months following successful treatment left her at the lowest risk for coronary heart disease and able to engage in a wide variety of daily activities.

After hearing testimony and carefully examining the medical records included within the agency record, the ALJ stated:

> According to the claimant , she is unable to work due to her hea[r]t condition which causes fatigue. She alleged that she is in poor physical condition and unable to stand for a period of time. She wrote that pain stops her from doing anything. She also experiences fatigue, weakness and dizziness. The claimant cleans her home, shops for groceries and performs yard work, albeit with difficulty. She rests during the day.
>
> At the hearing, the claimant testified that she has a drivers' license and drives a car. She estimated that she can lift five pounds but finds it difficult to move from side

8

> to side. She completed eleventh grade and can read and write in English. In her last job, the claimant had to lift one hundred pounds. She supervised selectors, the employees that kept the production machines operating. The claimant stopped working due to heavy lifting and bending. She subsequently had a quadruple bypass and her upper chest still hurts. She has pain in her right leg and spinal stenosis. She also has trouble with both wrists and was diagnosed with carpal tunnel syndrome in 1982. The claimant estimated that she can sit for one hour and stand/walk for one hour. On questioning from her representative, the claimant testified that she needs to lie down for six hours per day. She performs household chores with difficulty.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> For example, although the claimant has received treatment for the allegedly disabling impairments, *the treatment has been routine and conservative in nature*. She recovered well from the quadruple bypass surgery with only some residual tenderness at the incision sites on her chest and leg. She informed her physician that there are no side effects from her cardiac medications. With regard to the allegations of back pain, MRI scans do show some degenerative disc disease *which the neurologist characterized as mild*. The claimant underwent physical therapy and reported 80% improvement in her symptoms. She only occasionally used the Vicodin provided for pain relief. Although the claimant alleged carpal tunnel syndrome at the hearing, there is no evidence of this impairment anywhere in the medical records. Further, the diagnosis was in 1982 and this impairment was presumably present at the same level of severity prior to the alleged onset date. The fact that the alleged carpal tunnel syndrome did not prevent the claimant from working at that time strongly suggests that it would not currently prevent work. Finally, *the claimant has described daily activities which are not limited to the extent one would expect, given the claims of totally disabling symptoms and limitations*. The undersigned, after evaluating these reports, considers them an inconsistency bearing on credibility. These reports do not support the claimant's complaints of a disabling level of pain or illness and suggest that she is exaggerating her limitations.

AR 20-21 (*emphasis indicates language to which Plaintiff objects*) (*citations to hearing exhibits omitted*).

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence

undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand).

>Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; see also *Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Judge Rogers rejected Plaintiff's testimony based on multiple reasons well supported by facts in the record. Plaintiff's testimony concerning her daily activities and functional abilities was inconsistent with her claims of totally disabling symptoms. Plaintiff testified that she retained the ability to perform her own personal care, work around her house and yard, drive, shop, and maintain social and family relationships. Despite her claim that her condition was disabling, Plaintiff told Dr. Morgan of an active daily life consisting mainly of domestic activities such as housekeeping, cooking, running out to the grocery for dinner, and preparing meals for those who stopped by. She did not nap during the day. Plaintiff told Morgan she watched television, read, gardened, and cleared leaves, and that with her husband, she went to the movies and for long drives, ate out, and went to the casino and to flea markets. Morgan himself noted that Plaintiff was able to move freely around his office.

As the ALJ observed, when Dr. Felahy released Plaintiff to return to work, she did not go, but complained to Dr. Gee that she didn't feel up to par, tired easily, lacked sufficient strength; that the incision in her leg was still painful; and that she was still having chest pains. Dr. Gee rejected Plaintiff's complaints, characterized the pain as likely musculo-skeletal, and referred Plaintiff for cardiac rehabilitation to recondition her heart and return strength and mobility to her upper body. A month later, Dr. Ma also referred Plaintiff to physical therapy for reconditioning. Plaintiff did not go.

In response to Plaintiff's complaints, her cardiologist, Dr. Punjya, administered an exercise-gaited perfusion study to determine whether cardiac bypass surgery had successfully restored circulation in Plaintiff's heart. The test revealed no results of concern and no exercise-related changes to indicate ischemia. Similarly, Dr. Felahy referred Plaintiff for magnetic resonance imagery to determine the severity of her complaints of back pain. The MRI revealed

///

1 mild spinal stenosis at a single point.  Dr. Senegar's records report that physical therapy improved
2 Plaintiff's condition and stabilized her back condition.

3      Following his review of the record, agency consultant Dr. Lopez questioned Plaintiff's
4 credibility, observing that her health improved following her bypass surgery and that her reported
5 activities did not support her claims.

6      In short, substantial evidence supported Judge Rogers' assessment that due to the great
7 disparities between medical records and Plaintiff's subjective complaints, Plaintiff's subjective
8 complaints were not credible.  That Plaintiff would construe the evidence differently is
9 immaterial.

## V. Dr. Punjya's Opinion

11      Plaintiff contends that the ALJ erred in rejecting Dr. Punjya's opinions since he was a
12 treating physician.  The Commissioner responds that the ALJ properly rejected Dr. Punjya's
13 unsupported opinion.  The undersigned agrees.

14      Physicians render two types of opinions in disability cases: (1) medical, clinical opinions
15 regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to
16 perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound
17 by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041;
18 S. S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the
19 examining relationship; (2) the treatment relationship, including (a) the length of the treatment
20 relationship or frequency of examination, and the (b) nature and extent of the treatment
21 relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that
22 support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

23      Three types of physicians may offer opinions in social security cases: "(1) those who
24 treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the
25 claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant
26 (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally
27 entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,
28 and an examining physician's opinion is generally entitled to more weight than that of a non-

examining physician. *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.

Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Judge Rogers carefully reviewed Dr. Punjya's opinion, rendered on a questionnaire supplied by Plaintiff's attorney, in light of the agency record as a whole.  She stated:

> Little weight is given to the reports of the claimant's cardiologist to the effect that she is unable to perform full-time work at any exertion level.  The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported.  The doctor also relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.

AR 21 (*citations to hearing exhibits omitted*).

Dr. Punjya's uncritical acceptance of Plaintiff's subjective complaints is even more remarkable in light of his decision to administer the exercise-gaited perfusion study to determine whether cardiac bypass surgery had successfully restored circulation in Plaintiff's heart.  The test

revealed no results of concern and no exercise-related changes to indicate ischemia. As such, Dr. Punjya's opinion was inconsistent with his own objective records and was not supportable.

Dr. Punjya's opinion was also at odds with Plaintiff's medical records as a whole. After reviewing the administrative record, Dr. Cortez noted that, as evidenced by her reported daily activities, Plaintiff's health improved following bypass surgery. Dr. Felahy released Plaintiff to return to work in December 2006. Drs. Gee and Ma responded to Plaintiff's complaints with referrals for physical therapy to address the deconditioning that occurred while Plaintiff recovered from her bypass surgery and the subsequent infection of her incision. Dr. Senegar and physical therapist John Bob observed that physical therapy stabilized Plaintiff's very mild lumbar stenosis and improved her mobility. Dr. Morgan's report to Plaintiff's attorney also highlighted her active lifestyle following cardiac surgery.

An ALJ is not required to accept the opinion of any physician, including a treating physician, if the opinion is brief, conclusory, and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957. When a treating physician's medical opinion is contradicted by the opinion of another physician, much less his own records of treating the claimant, the ALJ is required to do no more than provide specific and legitimate reasons for discounting the treating physician's opinion. *Bray v. Commissioner of Social Security Admin.*, 554 F.3d 1219, 1228 n.8 (9th Cir. 2009). The ALJ did so here.

### VI.  Step Two: Inclusion of Spinal Stenosis as a Severe Impairment

Plaintiff contends that the ALJ erred in omitting spinal stenosis from her severe impairments. The Commissioner disagrees.

"The Step Two inquiry is a *de minimus* screening device to dispose of groundless or frivolous claims." *Salvatera v. Astrue*, 2012 WL 603205 at * 7 (E.D. Cal. February 23, 2012) (No. 1:10-cv-01464-SKO). *See also Bowen v. Yuckert*, 482 U.S. 137 (1987). At step two of the analysis, the claimant has the burden of producing medical evidence of signs, symptoms, and laboratory findings supporting the conclusion that his or her impairment is severe and can be expected to last more than twelve months. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005). "Although the regulations provide that the existence of a physical or mental impairment

must be established by medical evidence consisting of signs, symptoms, and laboratory findings, the regulations provide that under no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96-4p.  Nor may the existence of a severe impairment be based on the claimant's own testimony of his or her symptoms.  20 C.F.R. § 416.920(c).

The mere existence or diagnosis of an impairment is not sufficient to sustain a finding of disability.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993); *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990); *Key*, 754 F.2d at 1549.  Merely because Dr. Senegar diagnosed Plaintiff as having mild spinal stenosis did not require Judge Rogers to include it in the list of Plaintiff's severe impairments.

Even if the claimant is diagnosed with a listed impairment, that impairment may not qualify as a severe impairment as the impairment is not severe enough or if the claimant has not had it for a sufficient length of time.  *Kennedy v. Sullivan*, 919 F.2d 144 (table), 1990 WL 177973 (9th Cir. November 15, 1990) (No. 88-15609).  If the medical evidence indicates only a slight abnormality or combination of slight abnormalities that have no more than a minimal effect of the claimant's ability to work, the abnormality or combination of abnormalities is not a severe impairment.  SSR 85-28.  If a claimant's impairment is not severe, the ALJ must find the claimant not to be disabled at step 2.  *Wafer v. Sullivan*, 1994 WL 141649 at *4 (N.D. Cal. April 13, 1994) (No. C-92-3763 EFL); 20 C.F.R. § 416.920(a)(4)(ii).  This is the situation here where both Dr. Senegar and physical therapist John Bob noted that physical therapy stabilized Plaintiff's very mild lumbar stenosis and improved her mobility.

A severe impairment is one that significantly limits the claimant's physical or mental ability to perform basic work activities.  *Wafer*, 1994 WL 141649 at *4; 20 C.F.R. § 416.920(c). Basic work activities include "the abilities and aptitudes to do most jobs," including "(1) [p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) [c]apabilities for seeing, hearing, and speaking; (3) [u]nderstanding carrying out and remembering simple instructions; (4) [u]se of judgment; (5) [r]esponding appropriately to supervision, co-workers, and usual work situations; and (6) [d]ealing with changes in a routine

work setting." 20 C.F.R. § 416.921(b). In determining that an impairment is not severe, an ALJ need only find that the claimant retains the specific ability or aptitude. *Yanez v. Astrue*, 252 Fed.Appx. 792, 793 (9th Cir. 2007). Substantial evidence supported the ALJ's omission of spinal stenosis from the list of Plaintiff's severe impairments.

### VII. Side Effects of Medication

Plaintiff contends that, based on Plaintiff's subjective complaints, the ALJ erred in failing to consider the side effects of Plaintiff's medications in his analysis of her residual functional capacity. As discussed in section IV above, the ALJ found Plaintiff's subjective testimony less than credible. Because the medical records include no report of medication side effect but do note that Plaintiff denied experiencing side effects from her medication, the ALJ did not err in omitting medication side effects from his assessment of Plaintiff's residual functional capacity.

### VIII. Step Four Analysis

In a single paragraph, Plaintiff argues that the ALJ's step four analysis was unsupported by substantial evidence. Particularly in light of the undersigned's rejecting Plaintiff's contentions above, her argument has little merit. As discussed in section V above, the ALJ appropriately rejected Dr. Punjya's opinion of Plaintiff's residual functional capacity since it was inconsistent with both Dr. Punjya's own records as well as the administrative record as a whole. Accordingly, the ALJ properly invoked the opinions of the agency medical consultants, which constituted substantial evidence supporting her decision.

### IX. Conclusion and Recommendation

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported her determination that Plaintiff was not disabled. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Anthony W. Ishii, United States District Judge, pursuant to the provisions of 28 U.S.C § 636(b)(1). On or before September 21, 2012, any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

Plaintiff is advised that, by failing to file objections within the specified time, she may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:   August 22, 2012**             /s/ Sandra M. Snyder
                                                            UNITED STATES MAGISTRATE JUDGE